UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CYNTHIA P. GIPSON,                    )
                                      )
                    Plaintiff         )
                                      )
        vs.                           )       CAUSE NO. 2:10-CV-492 RM
                                      )
ARCELORMITTAL STEEL USA,              )
                                      )
                    Defendant         )

OPINION and ORDER

ArcelorMittal Indiana Harbor LLC (named in the complaint as Arcelormittal

Steel USA) has moved for summary judgment on Cynthia Gipson's employment

discrimination claims against the company. Ms. Gibson alleges that she has been

subjected to race discrimination and a hostile work environment during her

tenure at Arcelor's Indiana Harbor West plant in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Ms. Gibson submitted her objections

to Arcelor's motion, and Arcelor filed its reply. The court heard argument on

January 11. For the reasons that follow, the court concludes that Arcelor's motion

must be granted.

I. FACTS

The facts are gathered from the entire record and construed in the light

most favorable to Ms. Gipson, the non-moving party. Good v. University of Chicago

Med. Center, 673 F.3d 670, 673 (7th Cir. 2012). Cynthia Gipson has been employed by Arcelor and predecessor companies at its East Chicago, Indiana site since 2000. In 2009, she became a fire service technician/EMT in the first group of employees to begin work in Arcelor's Fire Service Unit, part of the company's Security and Emergency Department. Ms. Gibson, who still works in the Fire Service Unit, was, in 2009, the most senior of the unit's five employees and the only black member of the unit. Ms. Gipson is a member of United Steel Workers Local 1011.

Arcelor says that in early October 2009, the union conducted a poll in Ms. Gipson's department of employee preferences relating to work shift assignments. Arcelor reports that a majority of the department's workers indicated that they preferred having their work shifts locked in for a full calendar year. Ms. Gipson doesn't remember having had an opportunity to vote in that poll.

Based on the polls' outcome, Arcelor gave Ms. Gipson and the four other employees in the Fire Service Unit the opportunity to select their shift preferences for the calendar year 2010. Shifts available to unit employees included a single, steady shift or one of four rotating shift assignments. The steady shift required the employee to work Monday through Friday from 6 a.m. to 2 p.m. and to work floating shifts as needed to fill in for employees who were on vacation or otherwise absent; the rotating shift assignments required employees to work set days each week, but the actual shift times on those days could change from week to week.

Employees were asked to select their order of preference for days off if they chose the rotating shift: Friday and Saturday, Saturday and Sunday, Monday and Tuesday, or Wednesday and Thursday off. Arcelor says it structured the shifts for the Fire Service Unit so those employees could provide around-the-clock safety coverage to the plant and cover for employees who were late, absent, on vacation, or otherwise unable to work all or part of their shifts.

Ms. Gipson submitted her initial shift preference form on or about October 7, 2009, indicating that her first choice was the steady shift assignment. She also noted on her form that she wanted to work Sunday through Thursday, rather than Monday through Friday as the steady shift required, with no floater duties, as the steady shift also required. Pltf. Dep. Exh. 2. Ms. Gipson says that even though Kevin Vana, her supervisor, told her at that time that he didn't see a problem with her proposed schedule change, Arcelor didn't approve her proposal. Arcelor says the company didn't let any employee to modify the terms of predetermined shifts; Ms. Gipson says she believes Arcelor's action was based on her race.

On October 14, Arcelor met with the Fire Service Unit employees and their union representatives to explain the shift preference sheet and the available shift options. Ms. Gipson says she asked questions during the meeting, but received only vague answers in response. The next day, Ms. Gipson submitted a second work-shift preference form, indicating that her first choice was to work the rotating shift assignment with Fridays and Saturdays off, and her second choice

was to work the rotating shift assignment with Saturdays and Sundays off; she noted on the form, as well, that she was filing a "protest regarding seniority rights and scheduling." Pltf. Dep. Exh. 3. Ms. Gipson claims she was forced to submit the second form requesting a shift assignment she didn't want so she wouldn't forfeit her seniority benefits. Ms. Gipson says she submitted the form "under some degree of duress and uncertainty," Resp., at 3, and she thought the undesirable shift assignment would be temporary until her concerns were addressed through the grievance process.

Arcelor says Ms. Gipson was the unit's most senior member, so she was assigned her first choice — the rotating shift assignment with Fridays and Saturdays off. Deborah Hustin, one of Ms. Gipson's Caucasian co-workers, received the steady shift assignment, which required Ms. Hustin to work floating shifts for absent employees. Arcelor reports that Ms. Hustin worked that shift and filled in as a floater when required to do so until the next shift selection in October 2010. The shift preference sheets provided to Ms. Gipson and her co-workers read, in pertinent part, as follows: "Selection period October 1st-15th for next calendar year. Example: select 10/2009 for year 2010." Pltf. Dep. Exhs. 2 & 3. Ms. Gipson says she didn't understand that language.

Ms. Gipson filed a grievance on October 19, 2009 "protesting proposed scheduling in new fire department" and "requesting to work a steady shift assignment (day turns) & further requests not to be moved from the day turn to

fill other open assignments (floater)." Pltf. Dep. Exh. 5. The company denied her grievance on November 2. Pltf. Dep. Exh. 5 ("The Grievant was explained all of the available shift options. She chose the shift with Friday and Saturday days off. She was awarded that shift. She is not entitled to change her mind at this time.").

Ms. Gipson filed a charge of discrimination with the EEOC in April 2010, alleging that she suffered discrimination when Arcelor refused to provide her with "the policies and procedures" relating to the shift selection process and didn't tell her that the shift she selected in October 2009 would be effective through the end of 2010. She claimed that Arcelor discriminated against her based on her race.

After receiving her EEOC right to sue letter, Ms. Gipson filed her *pro se* complaint in this court claiming race discrimination and harassment/hostile environment. Ms. Gipson seeks the following relief: "to be treated equally and to be left alone; a stress free work environment; a steady day turn shift assignment; the ability to exercise my seniority rights; program to eliminate the hostile environment; compensation for the emotional damage, fear, harassment, intimidation, and the other internal battle that the company has caused." Ms. Gipson now has counsel.

Arcelor has moved for summary judgment based on its arguments that, first, Ms. Gipson can't establish a prima facie case of race discrimination, but even if she could the company has a legitimate non-discriminatory reason for its actions, and, second, Ms. Gipson's claims of harassment and/or a hostile work

environment are barred because neither claim was contained in her EEOC charge, and if those claims aren't barred, they are without merit.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, 477 U.S. at 255. The existence of an alleged factual dispute, by itself, will not defeat a summary judgment motion; "instead, the nonmovant must present definite, competent evidence in rebuttal," Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); *see also* FED. R. CIV. P. 56(e)(2). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving

party bears the responsibility of identifying the evidence upon which he relies." Hastings Mut. Ins. Co. v. LaFollette, No. 1:07-cv-1085, 2009 WL 348769, at *2 (S.D. Ind. Feb. 6, 2009); *see also* Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007) ("summary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events'" *(quoting* Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005)).

### III. DISCUSSION

#### A. *Harassment/Hostile Work Environment/Failure to Promote*

Arcelor argues that Ms. Gipson shouldn't be able to pursue claims that are outside the scope of her EEOC complaint. The company says Ms. Gipson made no mention of racial harassment, a hostile work environment, and/or failure to promote and allow overtime in the complaint she filed with the EEOC, but rather relied on a single instance of racial discrimination in connection with the October 2009 shift selection process. Arcelor asserts that the claims not contained in Ms. Gipson's EEOC complaint aren't reasonably related to her claim involving the shift selection process, so the "scope-of-the-charge" rule bars the additional claims.

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." Teal v. Potter, 559 F.3d 687, 691 (7th Cir. 2009). "An aggrieved employee may not complain to the EEOC of only certain

instances of discrimination, and then seek judicial relief for different instances of discrimination." Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992). Allowing a civil complaint to include allegations outside the scope of the EEOC complaint "would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the [employer] of notice of the charge." Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994). A plaintiff may litigate claims that weren't contained in the person's EEOC complaint only if those claims are "like or reasonably related" to the allegations of the administrative charge and can be seen as "growing out of such allegations." Teal v. Potter, 559 F.3d at 691-692. "At the very least, the claims should involve the same conduct and implicate the same individuals in order to be considered 'reasonably related' to the allegations of the EEOC complaint." Miller v. American Airlines, Inc., 525 F.3d 520, 525 (7th Cir. 2008).

Ms. Gipson admits that her written EEOC complaint, which she filed without the aid of counsel, only addressed Arcelor's October 2009 shift selection process, but she notes that she checked the box indicating that the action was "continuing." Ms. Gipson says that because she was unfamiliar with the process, she "simply reported the concern that was most pressing at the time of her complaint, and anticipated that further investigation by the EEOC would reveal and/or include her continuing claims of harassment and discrimination in scheduling. It was for this reason that she indicated 'continuing action' in her

complaint." Resp., at 10. Ms. Gipson argues that her claims in this court shouldn't be limited because she filed internal grievances about several of the continuing incidents, so "the EEOC's investigatory and conciliatory role is not frustrated by this court's consideration of these matters nor is the charged party of notice of the allegations or scope of the charge denied in any way." Resp., at 11-12.

Ms. Gipson's EEOC charge was limited to her complaint of racial discrimination in Arcelor's shift selection process, a claim she included in her civil complaint. Allegations in her civil complaint also include her claim that she was "harassed at work[], creating a hostile environment," and she "cannot reasonably perform work due to certain behavior by management/coworkers: unwarranted criticisms, intimidate, fear and stress;" additional allegations in Ms. Gipson's summary judgment response include her claims that she was continually passed over for promotions and overtime opportunities, and Arcelor breached certain provisions of the Basic Labor Agreement relating to temporary vacancies.

Applying a liberal standard to determination of whether Ms. Gipson's new claims are reasonably related to her EEOC charge, Miller v. American Airlines, Inc., 525 F.3d 520, 525-526 (7th Cir. 2008), the court concludes that Ms. Gipson's harassment, hostile work environment, and failure to promote and allow overtime claims don't involve the same conduct or facts as her shift selection process claim. Too, the court can't infer that a claim of racial discrimination

relating to a company policy would implicate the same individuals who might have harassed her or created a hostile work environment. The allegations in Ms. Gipson's EEOC charge were insufficient to put the EEOC on notice that she might have other unrelated claims that she wanted to raise but didn't, and to put Arcelor on notice of other claims she might be advancing, especially in light of the fact that many of the new instances of wrongdoing occurred after Ms. Gipson filed her EEOC complaint in April 2010 and after she had her pre-determination interview with the EEOC in August 2010.

Ms. Gipson's indication of "continuing" discrimination offered no hint that she expected the EEOC to investigate "other aspects" of her claim, and her claims of harassment, hostile work environment, and failure to promote and allow overtime can't be considered to be "reasonably related" to the allegation of race discrimination in her EEOC complaint. *See* Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 503 (7th Cir. 1994) ("When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge."). Ms. Gipson's claims of harassment, hostile work environment, and failure to promote and allow overtime are outside the scope of her EEOC complaint. Arcelor is entitled to summary judgment on those claims.

*B. Race Discrimination*

Title VII makes it unlawful for an employer to "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e(a)(1). Ms. Gipson can prevail on her Title VII claims "by putting in enough evidence, either direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the *McDonnell Douglas* formula." Rudin v. Lincoln Land Community Coll., 420 F.3d 712, 719 (7th Cir. 2005). Ms. Gipson proceeds under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), which requires her to show that (1) she belongs to a protected class; (2) she was performing her job satisfactorily, (3) she suffered an adverse employment action, and (4) a similarly-situated employee outside the protected class was treated more favorably.

If Ms. Gipson establishes a prima facie case of discrimination, the burden shifts to Arcelor to set forth a legitimate, non-discriminatory reason for its action. Jackson v. City of Chicago, 552 F.3d 619, 622 (7th Cir. 2009). If Arcelor meets that burden, the burden shifts back to Ms. Gipson to demonstrate that Arcelor's proffered reason is a pretext for intentional discrimination. Id. "Although intermediate burdens shift back and forth under the McDonnell Douglas framework, the ultimate burden of demonstrating that [Arcelor] intentionally discriminated always remains with [Ms. Gipson]." Benuzzi v. Board of Educ. of

<u>City of Chicago</u>, 647 F.3d 652, 662 (7th Cir. 2011) (*quoting* <u>Hudson v. Chicago</u> <u>Transit Auth.</u>, 375 F.3d 552, 561 (7th Cir. 2004)).

The parties agree that Ms. Gipson can establish the first two elements of a prima facie case: she belongs to a protected class and she was performing her job satisfactorily. Arcelor maintains she can't prevail on either of the other two elements of a prima facie case. According to Arcelor, Ms. Gipson's October 2009 shift assignment didn't constitute an adverse employment action because she didn't suffer any reduction in her pay, any loss of job responsibilities, or any material change in the terms or conditions of her employment. Arcelor says, too, that Ms. Gipson can't demonstrate that a similarly-situated employee not in the protected class received more favorable treatment.

*Adverse Employment Action*

An adverse employment action is one that is materially adverse, "not merely an inconvenience or a change in job possibilities." <u>Griffin v. Potter</u>, 356 F.3d 824, 829 (7th Cir. 2004). Any change to the "terms, conditions, or privileges" of employment must be significant, "although exactly what that means will vary on the facts of a given case." <u>Ellis v. CCA of Tenn. LLC</u>, 650 F.3d 640, 649 (7th Cir. 2011). Adverse employment actions have been found to exist in cases in which an employee's compensation, fringe benefits, or other financial terms of employment are diminished; in which an employee's career prospects are injured or stunted;

and in which "the *conditions* in which [the employee] works are changed in a way that subjects [her] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [her] workplace environment — an alteration that can fairly be characterized as objectively creating a hardship." Herrnreiter v. Chicago Housing Auth., 315 F.3d 742, 744 (7th Cir. 2002) (emphasis in original); *see also* Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001) ("[T]he employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way."). The issue, then, is whether the evidence, when viewed in the light most favorable to Ms. Gipson, establishes that she suffered an adverse employment action.

Ms. Gipson claims Arcelor effectively denied her the "right to the 'steady shift' she desired, had grown accustomed to, and should have been entitled to" because of her seniority. Resp., at 13. She complains that Arcelor coupled "a 'steady shift' with a requirement that the person holding said shift be responsible for 'floating' to cover all vacations and absences," which, she says, changed "the scheduling option [that] offers the most consistency (a highly desirable quality in a workplace dominated by rotating shift-type scheduling) [into] possibly the most inconsistent of any such options." Resp., at 13. Ms. Gipson claims the change in shift options amounted to a "significantly negative alteration" to her workplace. Resp., at 13.

Ms. Gipson also says she believes Arcelor's scheduling options conflicted with the following provision of the applicable Basic Labor Agreement:

> Where [Arcelor] establishes a steady shift schedule on a job where employees are also scheduled on rotating shifts, assignment to the steady shift schedule shall be by seniority, with the senior employees who desire to work the schedule given preference to the assignment in accordance with understandings reached between Plant Management and the Local Union Committeeman.

Pltf. Exh. A. According to Ms. Gipson, she "questioned the actions taken by [Arcelor] in apparent contravention of the Basic Labor Agreement, but was unable to obtain adequate answers," which resulted in her being forced to request assignment to the "'least desirable shift' in a last-ditch effort to avoid receiving the 'most undesirable shift.' All the while, the other similarly situated employees not in the protected class appeared to be much more informed about and much more satisfied with the scheduling options and their assignments." Resp., at 9.

Ms. Gipson lastly claims that Arcelor "effectively and constructively denied [her] an opportunity to question and properly grieve" the shifts that Arcelor made available to the Fire Service Unit employees due to Arcelor's "decision to hold an information meeting regarding the policy the day before the deadline for submission of preferences. . . . Had [Arcelor] scheduled the informational meeting earlier within this window, it is likely that [she] could have received more information concerning the policy and possibly had an opportunity for her grievance to be properly heard prior to the deadline for submission of preferences." Resp., at 15-16.

The provision of the Basic Labor Agreement that Ms. Gipson relies on requires Arcelor to assign the steady shift schedule by seniority. Arcelor has set forth the affidavit of Alissa Rosario, the company's former Human Resources Representative and current Labor Relations Representative, who says Ms. Gipson, as the most senior employee in her unit, was afforded the first choice in the shift selection process. Ms. Rosario explains that in October 2009, the Fire Service Unit employees "had a choice between four rotating shifts and a single steady shift; and in the case of the rotating shift, which days they wanted off. . . . Because [Ms.] Gipson was the most senior person in the unit, she was given her first choice during this October 2009 shift selection." Deft. Exh. 2 (Rosario Aff.), ¶¶ 6-7. Ms. Gipson designated the rotating shift assignment with Fridays and Saturdays off as her first choice, and she received that assignment with no reduction in pay, no loss of job responsibilities, and no other material change in the terms or conditions of her employment. Deft. Exh. 2 (Rosario Aff.), ¶ 7. Arcelor also presents evidence that Ms. Gipson didn't request to be assigned to the steady shift position available in her unit. *See* Pltf. Dep., Exhs. 2 & 3. Ms. Gipson hasn't challenged Ms. Rosario's affidavit statements or any of Arcelor's evidence.

Ms. Gipson claims that as the senior member of her unit, she was "entitled to a 'steady shift' if one was available in her unit." Resp., at 8. Arcelor has presented evidence that a steady shift was available to members of the Fire Service Unit, as well as evidence that Ms. Gipson was first in line to receive that shift had

she so chosen. Ms. Gipson's objection to the additional requirement of the steady shift assignment — filling in for other employees who were absent or on vacation — doesn't constitute evidence that a steady shift wasn't available, and her decision to not select the steady shift assignment isn't evidence that she was deprived of the opportunity to make the first choice of assignments in her unit. Ms. Gipson's purely subjective preference for one position over another, without more, is insufficient to support a finding that the shift selection process somehow violated the Basic Labor Agreement or that the shift options objectively created a hardship or resulted in a material change to the terms or conditions of her employment. *See* Ellis v. CCA of Tenn. LLC, 650 F.3d 640, 650 (7th Cir. 2011) ("A change in shift assignments will not normally be sufficient to qualify as an adverse employment action, unless it is accompanied by some other detriment."); Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir. 2001) ("Lau's decision to change Grube's working hours certainly does not rise to the level of an adverse employment action. Grube's pay and job title remained the same, and she suffered no significantly diminished job responsibilities.").

"At the very least, [Ms. Gipson] must show some quantitative or qualitative change in the terms or conditions of [her] employment that is more than a mere subjective preference." Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003). "In other words, to prove that an action was adverse, [Ms. Gipson] must show that the action was accompanied by some tangible, negative

consequence, such as termination, demotion, or ineligibility for promotions, favorable transfers, or advantageous increases in responsibilities." <u>Johnson v. Shinseki</u>, No. 08-C-0472, 2010 WL 1186312, at *8 (E.D. Wis. Mar. 22, 2010). She hasn't done so. Ms. Gipson's "subjective view of the significance and adversity of [Arcelor's] action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1240 (11th Cir. 2001); *see also* <u>Herrnreiter v. Chicago Housing Auth.</u>, 315 F.3d 742, 745 (7th Cir. 2002) (employment action must be "sufficiently severe to worsen substantially [the employee's] conditions of employment as they would be perceived by a reasonable person in [the employee's] position"). Ms. Gipson hasn't set forth or pointed to any evidence that would allow a fact-finder to reasonably conclude that the October 2009 shift selection resulted in a material change in the terms and conditions of her employment or that Arcelor's denial of her request for a shift assignment different from the ones available to all employees in her unit was an adverse employment action in violation of Title VII.

### Similarly Situated Employee

To establish that a similarly-situated employee outside the protected class was treated more favorably, Ms. Gipson "need not demonstrate complete identity [with the comparator]. What is required is 'substantial similarity,' given all

relevant factors in the case." <u>Luster v. Illinois Dep't of Corrections</u>, 652 F.3d 726, 730 (7th Cir. 2011). The question then is whether the situation of the comparator was similar enough to Ms. Gipson's to allow a fact-finder to reasonably infer, in the absence of some other explanation, that the differing treatment at issue was based on race or some other unlawful basis. <u>Id</u>.

Ms. Gipson argues that her white co-workers in the Fire Service Unit qualify as similarly-situated employees: she and those four co-employees worked in the same unit, held the same job classification, generally performed the same functions, and were subject to the same standards of conduct. Assuming that Ms. Gipson and her four co-employees performed the same tasks and were subject to the same standards and rules at Arcelor, Ms. Gipson still must demonstrate that she and the comparators "engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or [Arcelor's] treatment of them." <u>Teklehaimanot v. Park Center, Inc.</u>, 804 F. Supp. 2d 886, 907 (N.D. Ind. 2011) (*quoting* <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 617-618 (7th Cir. 2000)).

Ms. Gipson argues that her comparators were treated more favorably in the following respects: (1) they "apparently received answers to their questions and were ostensibly satisfied with the shifts they received;" (2) Ms. Gipson "had more to lose than any of the other four employees in this situation due to her level of seniority;" (3) when Ms. Gipson "was denied the opportunities for overtime and

temporary promotion . . . the vacancies she desired to fill were presumably filled by other employees from her department;" and (4) because those four weren't members of the protected class, Ms. Gipson "was inherently treated less favorably than other similarly situated employees not in the protected class." Resp., at 16.

Ms. Gipson's personal belief that her comparators "apparently" had their questions answered, were "ostensibly satisfied" with their shift assignments, and "presumably" filled in for other employees, without more, isn't evidence that any comparator was treated more favorably. *See* Trade Finance Partners, LLC v. AAR Corp., 573 F.3d 401, 407 (7th Cir. 2009) ("[T]he nonmoving party must point to specific facts showing that there is a genuine issue for trial; inferences relying on mere speculation or conjecture will not suffice."). Ms. Gipson's claim that she "had more to lose" than her comparators because she had more seniority isn't evidence that any comparator was treated more favorably; in fact, Ms. Gipson's distinguishing herself from her comparators based on seniority tends to support a finding that she and those comparators weren't really similarly-situated at all. Finally, Ms. Gipson's summary conclusion that because the four comparators aren't members of the protected class, she was "inherently treated less favorably" doesn't constitute evidence sufficient "to raise a reasonable inference that any of the actions about which [s]he complains happened to [her] *because of [her] race*." Herron v. DaimlerChrysler Corp., 267 F. Supp. 2d 941, 958 (S.D. Ind. 2003) (emphasis in original); *see also* Lake v. Fairview Nursing Home, Inc., No. 96C8546,

1997 WL 619834, at *4 (N.D. Ill. Sept. 12, 1997) ("Lake's mere suspicion that her supervisors discriminated against her — because she is black and they are white — is insufficient to create a genuine issue for trial."). Ms. Gipson hasn't argued or presented any evidence demonstrating a racial motivation on the part of Arcelor relating to the shifts assignments at issue or suggesting that Arcelor's actions were based on her race.

Ms. Gipson complains that she wasn't permitted to modify the shift options Arcelor made available to the Fire Service Unit employees so she could work a steady shift, with Saturday and Sunday off and no responsibility to fill in for vacations or absences of other employees. Ms. Gipson hasn't argued or presented any evidence to show that the four comparators with whom she claims she was similarly-situated were permitted to modify the shifts offered to them or were awarded shift assignments different from the ones made available to the Fire Service Unit employees on the shift preference sheet. Because Ms. Gipson hasn't presented any evidence that would allow a fact-finder to reasonably conclude that Arcelor treated a similarly situated employee more favorably than Ms. Gipson in the shift assignment process, she hasn't carried her burden of establishing a prima facie case of race discrimination.[1]

---

[1] Ms. Gipson argues in her response brief that she can establish a prima facie case of race discrimination under the direct method of proof established in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973). Resp., at 12. She later notes that "a plaintiff may prevail even under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker" and claims that she "has offered a set of facts which, coupled with circumstantial evidence offered at her deposition, would seem to indicate

## C. Disparate Impact

Ms. Gipson argues for the first time in her response brief that Arcelor's combining of the steady shift position with a floater requirement "had a disparate impact on [her] because she was the only employee in her unit with a legitimate expectation of receiving the 'steady shift.'" Resp., at 9. To prevail on a disparate impact claim, Ms. Gipson must present evidence that a neutral employment policy or practice had an adverse disparate impact on members of her protected class by "isolat[ing] and identify[ing] the specific employment practices that are allegedly responsible for any observed statistical disparities" and offering "statistical evidence of a kind and degree sufficient to show that the practice . . . caused [the discrimination complained of] because of [] membership in the protected group." Farrell v. Butler Univ., 421 F.3d 609, 616 (7th Cir. 2005); *see also* Raytheon v. Hernandez, 540 U.S. 44, 52 (2003) (describing disparate impact claim as challenging a neutral employment practice that nevertheless "fall[s] more harshly on one group than another"); U.S. E.E.O.C. v. Roadway Exp., Inc., No. 06 C 4805,

---

that defendant's actions are in fact pretextual." Resp., at 18. Viewing the evidence in the light most favorable to Ms. Gipson as the court must do at this stage of the litigation, the court concludes that Ms. Gipson has offered no direct evidence of race discrimination or established any basis upon which a fact-finder might reasonably infer discriminatory animus on the part of Arcelor. *See* Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir. 2006) ("Under the direct method, Raymond must prove that the motivation behind [the employer's] decision . . . was due to Raymond's race."); Lochard v. Provena St. Joseph Med. Center, 367 F. Supp. 2d 1214, 1218 (N.D. Ill. 2005) ("[D]irect evidence must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question."); Titus v. Illinois Dep't of Transp., No. 06 C 2508, 2007 WL 2994079, at *5 (N.D. Ill. Oct. 11, 2007) ("[D]irect evidence of discrimination would amount to [the employer's] admission that it took adverse employment actions against Titus based on his race.").

2007 WL 2198363, at *3 (N.D. Ill. July 31, 2007) ("Disparate impact . . . requires statistical correlation evidence demonstrating that a specific employment practice of the defendant has a disproportionately negative effect on members of the plaintiff's protected class.").

Ms. Gipson hasn't set forth any statistical evidence, and her lone allegation as to this issue relates only to the effect the challenged practice had on her, not on the protected class. *See* Resp., at 15 ("[W]hile defendant's scheduling proposal may appear facially neutral, it had a disparate impact on plaintiff."). In addition, Ms. Gipson didn't advance a disparate impact claim relating to Arcelor's shift assignment policy in her EEOC complaint or in the complaint she filed in this court. *See* Padron v. Wal-Mart Stores, Inc., 783 F. Supp. 2d 1042, 1050 (N.D. Ill. 2011) ("Plaintiffs' EEOC charges not only fail to use the term 'disparate impact,' but they also fail to allege any specific policy, much less one that could be construed as having a disparate impact on Defendant's [minority] warehouse employees."). Ms. Gipson's only mention of a claim relating to a disparate impact theory is in her response brief, and she cannot amend her complaint through her summary judgment response. Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002). Ms. Gipson has waived any claim she may be attempting to raise for recovery based on a disparate impact theory relating to the shift assignments made available in October 2009.

*D.  Legitimate Non-Discriminatory Reason*

Lastly, Arcelor asserts it has a legitimate non-discriminatory reason for the challenged employment action: the company offered Ms. Gipson and the employees in her unit "a predetermined choice of shifts [because] it needed to schedule them so that their services were being provided as close to around-the-clock as possible. Arcelor did not allow any employee, regardless of race, to customize their shift as they may have preferred." Deft. Memo., at 13. Arcelor also says that any claim Ms. Gipson may have that she suffered discrimination "is belied by the fact that [she] was given the first choice of the predetermined shifts among her co-workers, and she was awarded her first choice of those predetermined shifts." Deft. Memo., at 13.

Because Ms. Gipson hasn't carried her burden of establishing a prima facie case of race discrimination, the court needn't address Arcelor's legitimate non-discriminatory reason for its employment action. The company is entitled to summary judgment on Ms. Gipson's claims. *See* <u>Good v. University of Chicago Med. Center</u>, 673 F.3d 670, 679 (7th Cir. 2012) ("Summary judgment in the defendant's favor is proper if a plaintiff fails to set forth a prima facie case.").

IV.  CONCLUSION

Because Ms. Gipson hasn't presented any evidence – direct or circumstantial – from which a reasonable fact-finder could conclude that she was the victim of discrimination based on her race, the court GRANTS the motion of ArcelorMittal Steel USA for summary judgment [docket # 30] on Ms. Gipson's claims against the company and DIRECTS that judgment be entered for the defendant.

SO ORDERED.

ENTERED:  ___January 18, 2013___


___/s/ Robert L. Miller, Jr._____
Judge, United States District Court